UNITED STATES BANKRUPTCY COURT

District of Massachusetts


```
**************************
In Re Brian C. Sheehy     *
                          *          Case Number 11-11233FJB
**************************
```

ADVERSARY PROCEEDING:
COMPLAINT TO DETERMINE THE DISCHARGEABILITY OF A DEBT
PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and
523(a)(6)


Office and Professional Employees International Union,
Local 600 (Local 600 or Plaintiff) and pursuant to the
Local Rules of this Court under Fed. R. Bankr. P Rules
4004, 7004 and 9014, files this Complaint to Determine the
Discargeability of a Debt Pursuant TO 11 U.S.C. §§
523(a)(2)(A), 523(a)(4).


**CORE PROCEEDING**

1.  This adversary proceeding relates to the bankruptcy
    commenced under Chapter 7 captioned *In Re Brian C.
    Sheehy, Unites States Bankruptcy Court, District of
    Massachusetts, Case Number 11-11233FJB* and is a core
    proceeding under 28 U.S.C. §157(b)(2)(A), (I) and
    (O).

**SUBJECT MATTER JURISDICTION**

2. This Court has subject matter jurisdiction over this adversary case in bankruptcy pursuant to 28 U.S.C. § 1334(a) and 157(b)(1) and 11 U.S.C. § 523 because this is a core proceeding to determine the dischargeability of a particular scheduled debt of Defendant.

**VENUE**

3. Venue is proper in this District of Massachusetts under 28 U.S.C. § 1408. The District of Massachusetts is proper because Defendant filed his bankruptcy petition here.

**PARTIES**

4. Defendant Sheehy filed a Chapter 7 bankruptcy petition on February 17, 2011. The United States Trustee is represented by Stuart F. Grossman, Looney & Grossman, 101 Arch Street, Boston, MA 02110. The Defendant is represented by Gary W. Cruickshank, Law Office of Gary W. Cruickshank, 21 Custom House Street, Suite 920, Boston, MA 02110.

5. Defendant is an individual who served from approximately 2005 through 2010 as the Treasurer of the Plaintiff, OPEIU Local 600, as an elected official with a fiduciary obligation to Local 600 to maintain the treasury and bank accounts of Local 600

for the sole benefit of the membership of Local 600.

6. Plaintiff OPEIU Local 600 is a labor organization governed by its own Local 600 Constitution and Bylaws, representing over 320 employees of the Massachusetts Bay Transportation Authority in various titles.

**THE OPERATIVE FACTS UNDERLYING LOCAL 600'S CLAIMS AGAINST DEFENDANT AND FIRST CLAIM FOR RELIEF FOR NON-DISCHAREABILTY PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A)**

7. In early December, 2010, Sheehy and his personal attorney, George Gormley, were made aware that Local 600 had discovered serious financial irregularities by Sheehy during Sheehy's tenure as Local 600's Treasurer, including his unlawful taking of significant cash withdrawals from the Union's bank account.

8. On or about December 8, 2010, Defendant was sent a letter requesting that he appear before the Local 600 Executive Board to answer questions regarding his tenure as Treasurer.

9. Sheehy declined to attend any meeting personally, but arranged for his attorney and his attorney's private investigator to meet several times in December 2010

with the union's officers and the union's attorney, at which meetings the union disclosed, in detail, that it had discovered that Sheehy had taken funds from the union as cash withdrawals, excess payroll payments, direct checks written to Sheehy by Sheehy and unauthorized or other unlawful uses of the union's American Express credit card, amounting to approximately $250,000 in funds taken from the union that the union claimed to be without authorization, fraudulent, wrongful, and otherwise unlawful.

10. On or about January 12, 2011, Defendant was notified that Local 600 intended to hold a internal union Trial Board to consider charges against Defendant that he had fraudulently, illegally and without authorization or excuse, stolen, embezzled or otherwise converted the funds of Local 600 while Defendant served in the capacity of Treasurer, totaling $256,000.

11. On or about December 28, 2010, after being notified that Local 600 had discovered Defendant's illegal embezzlement, but prior to the scheduled trial board hearing, Defendant engaged in a fraudulent conveyance of real estate in Dennis, MA held in his and his wife's name as a tenants by the entirety, and

executed a promissory note for $50,000 giving his wife a secured interest in the ownership and equity of the real estate property.

12. On or about January 31, 2011, and after receiving notice of the Local 600 trial board proceeding, Defendant again engaged in a fraudulent conveyance when he executed a second promissory note for $52,072.50 further subverting his personal interest in the property in Dennis and granting an additional secured interest in the property to his wife.

13. These promissory notes and "loans" from Defendant's wife exceed the Defendant's stated value of the property of $312,500 placing debts against the Dennis home of the first mortgage of $290,825.15 and the two mortgages or notes held by his wife totaling $102,072.50 for a total claim of secured debt against the property of $392,897.65.

14. Plaintiff brings this adversary proceeding for the purpose, *inter alia,* of determining that Defendant's scheduled debt to Plaintiff results from fraud, embezzlement, and intentional wrongdoing that makes the debt non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

15. On or about October 27, 2010, Robert Didrikson was

installed as the position of President/Business Manager of OPEIU Local 600.

16. The former President/Business Manager of Local 600 was John P. Horan, who had served in that position since approximately 1998.

17. Local 600 is a labor organization representing approximately 350 employees of the Massachusetts Bay Transportation Authority (MBTA) who hold the titles of "Inspector" and "Chief Inspector."

18. Local 600's operations are governed by a Local Constitution and Bylaws, which are in turn, governed by the Constitution and Bylaws of the Office and Professional Employees International Union.

19. The only duly adopted Constitution and Bylaws for Local 600 are those that have been in effect since before 1998.

20. In or about September or October 2010, shortly before leaving office, former President Horan sought approval from the International Union for amendments to the Local 600 Constitution and Bylaws and by letter dated October 5, 2010 received such approval from the International Union.

21. Among these amendments were provisions that established a new rate of pay for the

President/Business Manager and a provision that specified that the Treasurer of Local 600 would be compensated for one (1) week's pay per month for performing the treasurer's duties.

22. Upon taking office in November 2010, Didrikson discovered that President Horan had not complied with the mandatory procedures for adopting amendments to the Local 600 Bylaws that, among other things, require approval and ratification by the membership of Local 600 for any amendments and that Horan had not disclosed to the International Union his failure to follow such procedures. In January 2011, these amendments were declared ineffective by a vote of the membership of Local 600 and immediately upon that vote, rescinded.

23. Despite Horan's failure to follow the mandatory procedures for amending the Local 600 Bylaws, Didrikson also learned that Horan had long ago implemented these changes and that Horan had printed a revised set of Bylaws containing these unapproved and unauthorized Bylaw changes.

24. The prior Bylaws contained the description of the duties and obligations of the Treasurer and provided only that he would be reimbursed for loss of

compensation and expenses incurred when serving as a delegate to conventions, conferences and regional meetings of the International Union.

25. From approximately 2004 until 2010, Brian C. Sheehy served as the Treasurer of Local 600.

26. In the 2010 campaign, Sheehy and one other ran for office as President/Business Manager against Didrikson to replace Horan upon his retirement. By virtue of Sheehy's decision to run for the President/Business Manager's position, Sheehy was not a candidate for the Local 600 Executive Board.

27. The Treasurer of Local 600 is selected by a vote of the Local 600 Executive Board from among the elected members of the Local 600 Executive Board.

28. After learning of his defeat as President/Business Manager, Sheehy undertook repeated efforts to install himself as a member of the Local 600 Executive Board with the stated intention of then being re-appointed as the Treasurer of Local 600.

29. Among other extraordinary efforts to have himself reinstalled to the Local 600 Executive Board, Sheehy contacted officials of the OPEIU International Union, officials of the Massachusetts AFL-CIO, and members of the newly elected Local 600 Executive Board.

30. Sheehy's efforts to be appointed to the Local 600 Executive Board were unsuccessful.

31. Shortly after taking office as President/Business Manager, Didrikson, along with his newly elected Treasurer, Michael Duggan, undertook a thorough review of the financial records of Local 600.

32. Duggan and Didrikson discovered that many financial records were missing from the Local 600 office and Duggan and Didrikson were required to obtain bank records for Local 600's accounts from the Mass Bay Credit Union ("Credit Union"), where Local 600's accounts were maintained.

33. After several weeks of careful review of the financial records that Duggan and Didrikson were able to find in the office or that they were able to obtain from the Credit Union and other sources, they discovered the following:

   a. Over a period dating from 2005 through 2010, Sheehy had regularly, fraudulently, without authorization and in violation of the Local 600 Bylaws, taken unauthorized cash withdrawals, under his personal signature, from the Local 600

bank account maintained at the Credit Union totaling approximately $102,502;

b. Over a period dating from 2005 through 2010, Sheehy had regularly, fraudulently, without authorization and in violation of the Local 600 Bylaws, paid himself through the Local 600 Payroll system, for two weeks' pay each month, totaling approximately $70,331 more than he was even arguably authorized to be paid under the improperly adopted Bylaw changes referred to above, when at most, he was arguably authorized to pay himself only for only one week's pay per month.

c. Over a period dating from 2005 through 2010, Sheehy had regularly, fraudulently, without authorization and in violation of the Local 600 Bylaws, paid himself checks under his own signature out of the Local 600 checking account for an additional amount of approximately $56,009.

d. Over a period dating from 2005 through 2010, Sheehy had regularly, fraudulently, without authorization and in violation of the Local 600 Bylaws, paid for unauthorized and unsubstantiated charges on an American Express card with his name

on the card but drawn on an American Express account with the bills delivered to Local 600, totaling approximately $19,795.54.

e. Over a period dating from 2005 through 2010, Sheehy had also approved a series of excessive payments to the former President, Horan, including excessive charges on an additional American Express card in Horan's name but bills sent to and paid for by Local 600.

34. The total amount that Didrikson has to date determined was paid to or on behalf of Sheehy, by Sheehy, fraudulently and without authorization and in violation of the Local 600 Bylaws from the Local 600 treasury from 2005 through 2010 amounts to $248,637.54.

35. Sheehy was notified both by Didrikson and Duggan that Local 600 had discovered financial irregularities and that Local 600 wanted to meet with him to discuss these problems.

36. Sheehy initially indicated to Didrikson that he was going to have his attorney contact Didrikson.

37. On or about December 3, 2010, Didrikson met with Attorney George F. Gormley and disclosed to him what

Didrikson had discovered that is summarized above in ¶32 above.

38. On or about December 8, 2010, Didrikson sent a letter to Sheehy notifying him that Local 600 had discovered financial irregularities and requesting that he attend a meeting of the Local 600 Executive Board to respond to these financial irregularities.

39. Sheehy sent a letter dated December 9, 2010 indicating that he would not attend this meeting but would be represented by Attorney Gormley.

40. After a series of correspondence and email between Gormley and Local 600's attorney, Howard Lenow, between December 10, 2010 and December 30, 2010, a meeting on December 23, 2010 between Didrikson, Lenow and Gormley's designated private investigator, Gormley was sent or given a description of Local 600's claims against Sheehy with copies of spreadsheets and documents detailing the payments outlined in ¶32 above.

41. On or about December 30, 2010, Gormley and his private investigator attended a meeting at Local 600 at which time Gormley presented Didrikson with a check for $40,000 that Gormley characterized as

intended to "reduce the amount of the bank account record keeping deficiency."

42. On or about December 16, 2010, Didrikson received a text message from Sheehy on Didrikson's mobile phone, that contained the following message:

*Hi Bob I know I've been advised not to contact you but please don't notify George or Howard. I fucked up terribly and made a major mistake. I breached the trust of a lot of people and acted like a total asshole along with it. With Georges help I am trying to make full restitution on the $93,000. Please keep the ball moving on this and let me restore the account to balance. I have seen Howard work and I hope and pray his involvement does not derail what George described to me as a productive meeting with you.*

*CB 617-438-7646*
*Dec. 16,    1:15 pm*

43. On or about January 17, 2011, Gormley presented Local 600 with an additional check for $53,072.50.

44. On or about January 4, 2011, Didrikson, along with Duggan and two other members of the Local 600 Executive Board, met with Horan to afford him an opportunity to respond to questions about Sheehy's role as Treasurer and to determine Horan's knowledge of the financial irregularities discussed above.  At this meeting, Horan offered the following;

   a. Horan claimed he was unaware of Sheehy's practice of taking cash withdrawals and that he had never

authorized Sheehy to take cash withdrawals from the union's bank account;

b. Horan claimed that Sheehy was entitled to one week's pay per month based upon the amendments to the Bylaws, but that he was not entitled to two week's pay per month and that Horan had never authorized such payments to Sheehy nor was he aware that Sheehy had been taking such payments;

c. Horan indicated that while Sheehy had filled in for Horan during Horan's vacations, and that during 2009, Sheehy filled in more than in prior years before during Horan's bereavement for his father's passing, and that when filling in for Horan's absence, Sheehy was entitled to be compensated for his "lost time" at his job at the MBTA, Horan indicated that he was was shocked that Sheehy had taken so much in direct compensation from Local 600 and that such large amounts were not authorized;

d. Horan indicated that Sheehy was only authorized to use the American Express card in Sheehy's name for direct office expenses or to pay for meals for members of Local 600 if attending a meeting on behalf of Local 600, but for no other reason.

45. On or about January 12, 2011, Local 600's attorney sent a letter to Gormley once again outlining a list of charges that had been brought against Sheehy under the Local 600 Bylaws and indicating that Sheehy would be subjected to an internal Trial Board hearing on January 20, 2011 at Local 600. (Attached as Exhibit D to Didrikson affidavit.)

46. On or about January 19, 2011, Didrikson was notified by Local 600's attorney that Gormley had sent a check to Local 600 for $52,072.50 to be applied to what Gormley characterized again as a record keeping deficiency by Sheehy.

47. On or about January 21, 2011, Local 600's attorney notified Gormley that because of the procedural requirements of the OPEIU International Constitution, the Trial Board hearing at Local 600 regarding Sheehy would be rescheduled for February 18, 2011.

48. On or about February 17, 2011, the day before the scheduled Local 600 Trial Board hearing, Local 600 was notified that Sheehy had filed a petition for bankruptcy and that Attorney Gormley was demanding that Local 600 refrain from holding the Trial Board

hearing pursuant to the automatic stay provisions of the Bankruptcy Code.

49. As a compromise only with regard to deferring the Trial Board hearing, Sheehy tendered his resignation as a member of Local 600 in exchange for Local 600's agreement to postpone the Trial Board hearing.

50. Since that date, Didrikson has learned through a review of public records and from documents presented to Local 600's attorney by Sheehy's bankruptcy attorney, that Sheehy took the following actions in December 2010 with respect to property owned in his name:

   a. On or about September 25, 2008, Sheehy and his wife had purchased a home in Dennis, MA for $380,000 with a $300,000 mortgage, holding the property as tenants by the entirely.

   b. On or about September 27, 2009, Sheehy and his wife refinanced the Dennis home for $299,500.

   c. On or about December 28, 2010, Sheehy and his wife transferred to property to themselves as tenants in common and Mr. Sheehy received $50,000 from his wife secured by a second mortgage on the Dennis property.

d. On or about January 31, 2011, Mr. Sheehy received a second payment from his wife, this time in the amount of $52,072.50, second by another mortgage on the Dennis property.

51. The Dennis property owned by the Sheehy's is claimed under Schedule C of Sheehy's filings with this Court as valued at $312,500.

52. The three mortgages taken out on the Dennis property now total $392,897.65.

53. Defendant's actions in converting or embezzling union funds for his personal use without authorization, wrongly, fraudulently, in violation of his fiduciary duties as Treasurer and otherwise unlawfully, has no defense in law or otherwise. To date, as set forth above, despite repeated requests and demands, Defendant has forwarded only $95,023 of the funds unlawfully, fraudulently and otherwise wrongfully taken from Local 600's treasury.

54. Defendant knew that his taking of the funds described above from Local 600's treasury was wrong, unlawful, fraudulent or otherwise without authorization and his defenses, such as they are, are made falsely, without good faith or without justification. Defendant has

used or asserted false or dishonest defenses as "delay tactics" to fraudulently engage in transfers of property and to prepare the instant bankruptcy petition to avoid liability or responsibility to repay to Plaintiff the funds fraudulently, wrongfully, unlawfully or without authorization taken from Plaintiff and to have more time to steal, divert, misappropriate, embezzle, or conceal personal assets of Sheehy necessary and due and owing to Plaintiff.

55. Defendant engaged in a course of conduct that was aimed, designed or intended to cover up his unlawful, fraudulent, dishonest and otherwise unlawful taking of funds from Local 600 by first seeking to remain as an officer of Local 600 by seeking election as President/Business Manager, by then seeking to unlawfully gain appointment to a position on the Local 600 Executive Board and regain his position of Treasurer in order to protect against disclosure of his unlawful activities as former Treasurer, and by otherwise engaging in delays or bad faith efforts to meet with Local 600 in order to fraudulently convey property interests and by filing the instant petition for bankruptcy.

56. Defendant intended for Plaintiff to rely on the

foregoing schemes and pretenses to avoid responsibility, liability and repayment to Plaintiff.

57. Plaintiff acted immediately, reasonably and justifiably to recover funds taken from Local 600 by Sheehy upon discovering the foregoing schemes, misrepresentations and pretenses.

58. As a direct and proximate result of Defendant's fraudulent schemes, misrepresentations and pretenses and Plaintiffs reasonable reliance thereon, Defendant obtained, stole, diverted, misappropriated, embezzled, converted, and concealed at least,from what has been discovered to date in excess of $256,000 belonging and payable to Plaintiff.

59. As set forth above, Defendant obtained money from Plaintiff by false pretenses, false representations, and actual fraud, which were committed both orally and in writing. Accordingly, pursuant to 11 U.S.C. § 523(a)(2)(A), Defendant is not entitled to a discharge of Plaintiff's claim against it in the amount of $155,565.54, plus transaction costs, costs of suit, attorney fees, and interest.

**SECOND CLAIM FOR RELIEF, NON-DISCHARGEABILITY OF DEBT, 11 U.S.C. § 523(A)(4)**

60. Plaintiff fully incorporates all preceding Paragraphs by this reference.

61. Pursuant to 11 U.S.C. § 523(a)(4), a discharge under Section 727 does not discharge a debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

62. As set forth more fully above, Defendant has willfully, wrongfully, intentionally, and fraudulently taken at least $250,000 belonging and payable to Plaintiff from Local 600 while acting as Local 600's treasurer and fiduciary, without Plaintiffs consent, and has further committed embezzlement and larceny, for the use of Defendant. Accordingly, pursuant to 11 U.S.C. § 523(a)(4), Defendant is not entitled to a discharge of Plaintiffs claim against it in the amount of $155,565.40, plus transaction costs, costs of suit, attorney fees, and interest.

**THIRD CLAIM FOR RELIEF, NON-DISCHARGEABILITY OF DEBT, 11 U.S.C. §523(A)(6)**

63. Plaintiff fully incorporates all preceding Paragraphs by this reference.

64. Pursuant to 11 U.S.C. § 523(a)(6), a discharge under Section 727 does not discharge a debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity.

65. As set forth more fully above, Defendant has willfully and maliciously injured Plaintiff and its property by obtaining, stealing, diverting, misappropriating, embezzling, converting, and concealing his taking of at least $250,000 or more belonging and payable to Plaintiff without Plaintiffs consent or authorization, for the use by Defendant and then failing and refusing to explain what happened to the money. Accordingly, pursuant to 11 U.S.C. § 523(a)(6), Defendant is not entitled to a discharge of Plaintiff's claim against it in the amount of $155,565.40, plus transaction costs, costs of suit, attorney fees, and interest.

**FOURTH CLAIM FOR RELIEF, NON-DISCHARGEABILITY OF DEBT AND AVOIDANCE OF FRAUDULENT REAL ESTATE CONVEYANCE, 11 U.S.C. 544, 547 and 548**

66. Plaintiff fully incorporates all preceding Paragraphs

by this reference.

67. Pursuant to 11 U.S.C. § 523(a)(6) and 11 U.S.C. 544, 547 and 548, a discharge under Section 727 does not discharge a debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity or permit the fraudulent transfer of property where the debtor made such transfer or incurred an obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on on after the date that such transfer was made or such obligation incurred, indebted, or was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation or intended to incur or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

68. Plaintiff should be permitted to sponsor this claim for avoidance based upon fraudulent transfer in order to protect its rights in the event the Trustee fails or refuses to assert such claims.

***PRAYER FOR RELIEF***

WHEREFORE, Plaintiff respectfully requests that the Court render a judgment as follows:

1. That the Court order, adjudge, and decree that Plaintiffs claim against Defendant in the amount of $155,565.40, plus transaction costs, costs of suit, attorney fees, and interest, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

2. That the Court order, adjudge, and decree that Plaintiffs claim against Defendant in the amount of $155,565.40, plus transaction costs, costs of suit, attorney fees, and interest, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4);

3. That the Court order, adjudge, and decree that Plaintiff's claim against Defendant in the amount of $155,565.40, plus transaction costs, costs of suit, attorney fees, and interest, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6);

4. That the Court order, adjudge and decree that Plaintiff's clalim against Defendant in the amount

of $155,565.40, plus plus transaction costs, costs of suit, attorney fees, and interest, is non-dischargeable and that the fraudulent transfer of debtor's interests in real estate held in Dennis be declared fraudulent and voided as such;

5. For costs of suit herein;

6. For attorney fees herein;

7. For all other relief that the Court deems just and proper.

RESPECTFULLY SUBMITTED

OPEIU LOCAL 600

BY ITS ATTORNEY

/s/Howard B. Lenow

Howard Lenow
Lenow & McCarthy
13 Pelham Island Road
Wayland, MA  01778
BBO# 293660
508.358.8181
508.358.8989 (fax)
lenow@masslaborlaw.com